**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>KRIS DANIEL ROGLIERI,<br><br>        Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 24-10157-1-rel |
| 1800 PARK AVENUE LLC,<br><br>        Plaintiff,<br><br>v.<br><br>PRIME COMMERCIAL LENDING, LLC, PRIME CAPITAL VENTURES, LLC, KRIS DANIEL ROGLIERI, KIMBERLY A. HUMPHREY a/k/a KIMMY HUMPHREY, ERIK MARTIN, SCOTT DIBERARDINIS,<br><br>        Defendants. | Adv. Pro. No. _____ |

## COMPLAINT

Plaintiff 1800 Park Avenue LLC ("**Plaintiff**"), through its attorneys, Carpenter, Hazlewood, Delgado & Bolen, LLP, for its Complaint against Defendants Prime Commercial Lending, LLC ("**Prime Commercial**"), Prime Capital Ventures, LLC ("**Prime Capital**"; Prime Capital and Prime Commercial are collectively referred to as "**Prime**"), Kris Daniel Roglieri ("**Debtor**" or "**Roglieri**"), Kimberly A. Humphrey a/k/a Kimmy Humphrey ("**Humphrey**"), Erik Martin ("**Martin**"), and Scott DiBerardinis ("**DiBerardinis**") (Prime, Debtor, Humphrey, Martin, and DiBerardinis are collectively referred to as the "**Defendants**"), alleges as follows:

- 1 -

**PRELIMINARY STATEMENT**

1.  This case involves claims related to what appears to be a multi-state fraud scheme perpetrated by Defendants with victims holding claims for well over $75 million for return of deposits, which were paid and then not returned.

2.  Plaintiff is seeking recovery of its funds that were deposited with Prime upon Plaintiff's reasonable reliance on what were actually fraudulent representations made by Defendants.

3.  Plaintiff is also seeking an award of compensatory and statutory damages resulting from Defendants' theft of Plaintiff's funds and refusal to return them.

**PARTIES**

4.  Plaintiff is a limited liability company formed under the laws of Minnesota and does business in Renville County, Minnesota. Plaintiff's sole member, Wise Eggs LLC, a limited liability company formed under the laws of Minnesota, has two members: Jeffery A. Huston, who resides in and is a citizen of the State of Minnesota, and Gabriel A. Olson, who resides in and is a citizen of the State of Minnesota.

5.  Prime Commercial is, upon information and belief, a New York limited liability company, having its principal place of business located at 66 Pearl Street, 10th Floor, Albany, New York 12207.

6.  Prime Capital is a Delaware limited liability company having its principal place of business located at 66 Pearl Street, Albany, New York 12207.

7.  Debtor is, upon information and belief, the sole member of Prime Commercial and Prime Capital.

8. Defendant Humphrey is, upon information and belief, a citizen of the Commonwealth of Virginia, and resides at 600 Linkhorn Drive, Virginia Beach, Virginia 23451.

9. Defendant Martin is, upon information and belief, a citizen of the State of New York, and resides at 479 North Winton Road, Apt. 2, Rochester, New York 14610.

10. Defendant DiBerardinis is, upon information and belief, a citizen of the State of New York, and resides at 26 Valley Brook Drive, Fairport, New York 14450.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

12. Venue is proper in this district under 28 U.S.C. § 1409(a). This adversary proceeding is related to a bankruptcy case under Chapter 11 that is pending in this district (Case No. 24-10157-1-rel).

13. This adversary proceeding is commenced pursuant to section 523(c) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") 4007 and 7001(6).

14. Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

## FACTUAL ALLEGATIONS

15. Plaintiff is the owner and developer of a parcel of commercial property in Renville County, Minnesota. In mid-to-late 2023, Plaintiff was looking for an approximately $100 million loan to develop and construct a commercial egg production facility. Plaintiff was introduced to Prime through a loan broker.

16. Before entering into any deal with Prime, Jeffery A. Huston, the President of Plaintiff, as well as Plaintiff's loan broker, reviewed Prime's website and its stories of making multiple loans, including an alleged $188 million dollar loan to ALUX Properties (https://primecommerciallending.com/).

17. Among the representations on Prime's website are that Prime is "A Boutique Investment Bank" with "Over $10 Billion in Transactions Financed."

18. These statements are false and are intentionally made to deceive the public. Neither Prime Commercial nor Prime Capital is "A Boutique Investment Bank" or any form of "bank." Indeed, Prime Capital is not even registered to do business in New York.

19. Roglieri (through Prime) put out a public relations newswire announcing that "Prime Capital Ventures, which serves as Prime Commercial Lending's Large Balance Real Estate Fund" had funded a "successful $188 million deal with ALUX Properties, LLC for The Bailey, slated to be the first 5-Star luxury hotel and mixed-use property in Atlanta, GA."

20. As part of his marketing campaign, Roglieri created a YouTube video touting the alleged $188 million loan to ALUX Properties. Among other things, that video stated about Prime: "We Are Not Bankers . . . We Are Entrepreneurial Bankers."

21. This marketing was a complete fraud, as Prime Capital never made any such loan to ALUX Properties.

22. In order to convince third-parties that Prime was a legitimate lender, Roglieri claimed in the article that Prime Capital (just founded some 6 months before) had already funded multiple large commercial lending deals including:

(a) the $188 million "Bailey" project in Atlanta;

(b) apartment complexes in South Korea for $110 million and $300 million; and

(c) $2.3 billion in Dubai for a "massive mixed use property in the city's center."

23. Upon information and belief, the alleged projects in South Korea and Dubai were completely fabricated to induce unsuspecting victims to deposit funds with Prime on the basis that it was going to provide a loan.

24. Mr. Huston reasonably relied upon statements made on Prime's website, as well as the due diligence conducted by Plaintiff's loan broker, in concluding that Prime appeared legitimate. In reliance upon this information, Mr. Huston, as President of Plaintiff, made the determination to do business with Prime.

25. On October 20, 2023, DiBerardinis (purportedly acting through both Prime Commercial and Prime Capital) represented that Prime Capital had the ability to fund a $105 million loan in the form of a "Terms and Contingent Letter of Intent" ("**Term Sheet**") issued to Plaintiff for that line of credit. Under the Term Sheet, Plaintiff would have been required to fund an "ICA deposit" to Prime Capital in the amount of $26,277,562.

26. Prime Capital subsequently issued to Plaintiff a "Commitment to Fund Letter" dated December 12, 2023, in which Prime Capital committed to fund the line of credit in the amount of $98,905,467 (the "**Commitment to Fund**"). The Commitment to Fund was executed by Roglieri on behalf of Prime Capital, and was countersigned by Mr. Huston on December 12, 2023, on behalf of Plaintiff.

27. On December 14, 2023, DiBerardinis sent draft loan documents to Plaintiff's loan broker that stated the lender was "Prime Commercial Lending, LLC" not Prime Capital. No explanation was provided for the change from Prime Capital to Prime Commercial at the time the draft loan documents were provided.

28.     Defendants, in their communications with Plaintiff, failed to distinguish between Prime Commercial and Prime Capital, and effectively acted as though they were one and the same entity.

29.     In emails sent December 11, 2023, December 15, 2023, and December 18, 2023, DiBerardinis represented that Plaintiff and Prime needed to "soft close" on the loan transaction prior to the last week of December, intentionally implying that there was risk of losing the deal if that did not happen and pressing for Plaintiff to agree to the proposed loan documents.

30.     While unknown to Plaintiff at the time, an involuntary bankruptcy petition was filed against Prime Capital on December 19, 2023 (*In re Prime Capital Ventures, LLC*, 23-11302 (Bankr. N.D.N.Y.) (the "**Prime Bankruptcy Case**").

31.     On Tuesday, December 19, 2023, at 11:22 a.m., Martin (who has a signature block representing that he is a Vice President of Prime Commercial) sent an email in which he stated that "If we don't make this soft close happen this week, we may lose the deal altogether. The ICA will jump as well as the rate, and may require a whole new underwrite." Upon information and belief, this representation was knowingly false and intended to induce Plaintiff to consummate a "soft close" of the loan transaction and send Prime the required ICA deposit.

32.     Plaintiff did not want to lose the potential financing, so it negotiated with Defendants that it would send a $5,000,000 initial deposit that would be held in trust and not used for any other purpose until such time as the parties could attempt to close the potential financing.

33.     On December 21, 2023, Mr. Huston received an email from Humphrey, a representative of Prime, with a draft "Deposit Agreement" to govern the $5,000,000 deposit, which was drafted to be between Plaintiff and Prime Commercial. The Deposit Agreement attached wire

- 6 -

instructions, which said that Plaintiff should wire funds to an account at KeyBank allegedly held in the name of Prime Commercial.

34. Counsel for Plaintiff revised the proposed Deposit Agreement to ensure that the $5,000,000 deposit from Plaintiff would be held in trust and not used for any other purpose. This was essential to Plaintiff as it had not reached any final agreement with Prime Capital or Prime Commercial regarding a line of credit.

35. On December 22, 2023, the Deposit Agreement was executed by Roglieri on behalf of Prime Commercial and by Plaintiff.

36. The Deposit Agreement specifically states:

> The Lender [Prime Commercial Lending, LLC] hereby acknowledges receipt of such funds and agrees to hold the Deposit Amount in a separate and distinct account for Borrower, subject to the terms and conditions of this Agreement. The Deposit Amount should be **held as a trust fund** and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto.

Deposit Agreement at 2 [Sec. 2.a.] (Emphasis added).

37. In accordance with the Deposit Agreement, Plaintiff wired $5,000,000 to the KeyBank account provided by Humphrey on December 22, 2023.

38. The existence of the Prime Bankruptcy Case and the Court's *Order Appointing Interim Chapter 7 Trustee* entered December 21, 2023 ("**Trustee Order**"), were never disclosed to Plaintiff until after the $5,000,000 deposit was made.

39. Plaintiff demanded that its $5,000,000 be returned, which was formalized in a letter from counsel for Plaintiff, dated January 3, 2024, sent to Prime Commercial pursuant to the notice provisions of the Deposit Agreement (the "**Demand Letter**"). Diberardinis, a representative of Prime, acknowledged receipt of the Demand Letter in an email received at 4:30pm MST on January 3, 2024.

40.  Plaintiff has subsequently obtained copies of KeyBank account statements related to the $5,000,000 deposit. The first statement (account no. xxxx2233) was not in the name of Prime Commercial as falsely represented by Humphrey and Roglieri. Rather, it was in the name of Prime Capital (the "**Prime Capital Account**"). The KeyBank Prime Capital Account statement shows that the Prime Capital Account had a $1,923.66 account balance on December 22, 2023 prior to the $5,000,000 deposit. The statement shows Plaintiff's $5,000,000 wired in. That same statement then shows that exact amount being transferred out with an internet transfer on December 22, 2023, with the full $5,000,000 being transferred to another KeyBank account ending in xxxx4465.

41.  The transfer of Plaintiff's $5,000,000 deposit out of the Prime Capital Account was in direct violation of the Court's Trustee Order entered in the Prime Bankruptcy Case.

42.  Plaintiff also obtained a copy of the December 2023 bank account statement for KeyBank account no. xxxx4465, which is in the name of Prime Commercial (the "**Prime Commercial Account**"). The ending balance in this account for the day prior to the internet transfer of the $5,000,000 was $57,045.90. The KeyBank Prime Commercial Account statement shows that immediately after the $5,000,000 was transferred over to the Prime Commercial Account, the funds were dissipated. Among other things, portions of Plaintiff's $5,000,000 deposit were wired to the law firms which have appeared to represent Prime Capital in the Prime Bankruptcy Case and now in the civil lawsuit brought by Compass-Charlotte 1031, LLC, pending in the US District Court for the Northern District of New York (case no. 1:24-cv-00055-MAD-DJS; the "**Compass-Charlotte Lawsuit**").

43.  That same December 2023 bank account statement for the Prime Commercial Account shows Plaintiff's $5,000,000 trust funds being used for the following unauthorized purposes: (a)  On December 26, 2023, $84,000 wired to "Wrist Afficionad", which upon

information and belief is Wrist Aficionado, a luxury watch seller, according to its website wristaficionado.com; and (b) On December 26, 2023, $101,000 wired to "Xo Global, Llc", which upon information and belief is XO Global, LLC, a private air charter broker operating under the brand XO.

44. That same December 2023 bank account statement for the Prime Commercial Account shows $2,000,000 of Plaintiff's $5,000,000 trust funds being wired to "CPH LLC" for unknown reasons, and $950,000 of Plaintiff's $5,000,000 trust funds being transferred to a separate account, both of which occurred on December 22, 2023, the same date Plaintiff wired the funds to Prime.

45. According to the verified complaint filed by Caruso Home Builders, LLC, and Sage Estates Malta, LLC, against Prime Capital (*Caruso Home Builders, LLC, et al. v. Prime Capital Ventures, LLC*, New York Supreme Court, County of Saratoga, Index No. EF2024312, filed January 29, 2024; the "**Caruso Homes Lawsuit**") Caruso Homes received $950,000 from Prime Capital on December 22, 2023. Upon information and belief, this $950,000 payment is the same $950,000 transferred out of Plaintiff's trust funds on December 22, 2023.

46. Defendants' use of the Plaintiff's trust funds for any purpose was directly contrary to the terms of the Deposit Agreement, which specified that those funds were "held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto."

47. Despite repeated demands on representatives of Prime and Prime's counsel, no money has been returned to Plaintiff.

48. Based upon a review of the KeyBank account statements, it is evident that Prime never held the $5,000,000 deposit in trust and instead Defendants used those trust funds to pay

unrelated and unauthorized expenses, including luxury goods and services for personal use and payments to the lawyers litigating for Defendants (among other uses).

49. On January 12, 2024, an order was entered in the Compass-Charlotte Lawsuit appointing Paul Levine as temporary receiver over Prime Capital and others. On January 19, 2024, Mr. Levine as receiver filed his *First Report of Temporary Receiver* in the Compass-Charlotte Lawsuit (Doc. 37) in which he detailed his efforts to obtain information and records related to the defendants in that case. Subsequently, on January 26, 2024, Mr. Levine filed his *Second Report of Temporary Receiver* in the Compass-Charlotte Lawsuit (Doc. 61), which detailed Prime Capital's failure to comply with his requests for records and information. Mr. Levine filed an *Amended Second Report of Temporary Receiver* later that same day, which confirmed a luxury watch purchased for over $2,000,000 by Prime for Roglieri's personal use was now in the possession of the Receiver (Doc. 65).

50. A number of lawsuits have been filed against one or more Defendants alleging similar facts and fraudulent scheme conducted by Defendants. Plaintiff is aware of at least ten separate lawsuits alleging a similar fraud.

51. On February 15, 2024, Roglieri filed for bankruptcy protection under Chapter 11, Subchapter V, of the Bankruptcy Code.

52. The Section 341 Meeting of Creditors was held on March 14, 2024, at which Roglieri represented under oath that he was the sole person with access to the Prime Capital Account and the Prime Commercial Account, and sole person with the power to transfer or withdraw funds from those accounts.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract against Prime Commercial)**

53. The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

54. The Deposit Agreement is a valid contract.

55. Plaintiff performed its obligations under the Deposit Agreement.

56. Prime Commercial breached the Deposit Agreement by failing and refusing to make payment to Plaintiff in the amount of $5,000,000.00, after Plaintiff exercised its right to demand return of the funds pursuant to Section 3.b. of the Deposit Agreement.

57. Prime Commercial's breach has damaged Plaintiff in an amount to be determined at trial, but believed to be in excess of $5,000,000.00, plus interest.

**SECOND CLAIM FOR RELIEF**
**(Fraudulent Inducement against all Defendants)**

58. The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

59. Defendants, through Roglieri, Martin, DiBerardinis and Humphrey, as well as in the Term Sheet and Commitment to Fund, represented to Plaintiff that: (i) Prime was willing and able to consummate the loan transaction; (ii) Prime was willing and able to perform under the proposed loan terms; (iii) Plaintiff's $5,000,000 deposit would be kept in a separate and distinct account for Plaintiff; and (iv) Plaintiff's $5,000,000 deposit would be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of Prime Commercial; all of which were material false representations. Defendants also made material false representations on its website and through news articles as specifically detailed in the paragraphs above.

60. Defendants' representations were false when they were made and Defendants knew them to be false. Further, Defendants knew or had reason to know that Plaintiff was relying on their statements. Thus, Defendants' statements were reasonably calculated to deceive for the purpose of defrauding Plaintiff.

61. Plaintiff reasonably relied upon the representations described above.

62. Plaintiff suffered damage as a result of such reliance. Specifically, Plaintiff has been in an amount to be determined at trial, but believed to be in excess of $5,000,000.00, which was the amount of the deposit paid to Prime in reliance of Defendants' representations.

### THIRD CLAIM FOR RELIEF
**(Conversion against Prime and Roglieri)**

63. The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

64. Prime and Roglieri have intentionally and without authority exercised control over Plaintiff's property and have refused to return Plaintiff's property.

65. The $5,000,000.00 belongs to Plaintiff.

66. Neither Prime nor Roglieri have any authority in law or equity to retain Plaintiff's $5,000,000.00.

67. Prime and Roglieri have unlawfully exercised dominion over Plaintiff's $5,000,000.00, in derogation of Plaintiff's rights.

68. The $5,000,000.00 constitutes a specifically identifiable fund that Prime and Roglieri were obligated to maintain in trust.

69. Plaintiff has demanded the return of its money and the deposit has not been repaid.

70. Accordingly, Plaintiff has suffered damages in an amount to be determined at trial, but believed to be in excess of $5,000,000.00, plus interest.

## FOURTH CLAIM FOR RELIEF
### (Civil Racketeer Influenced and Corrupt Organizations Claim Pursuant to 18 U.S.C. § 1964(c) against Roglieri, Martin, DiBerardinis and Humphrey)

71. The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

72. The Civil Racketeer Influenced and Corrupt Organizations (RICO) Act provides that "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee" (18 U.S.C. § 1964(c)).

73. 18 U.S.C. § 1962(c) provides that "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…"

74. At all times relevant to Plaintiff's claims, Defendants were associated with and comprised an enterprise (as "enterprise" is defined in 18 U.S.C. § 1961(4)) that engaged in acts and activities that affect interstate commerce, including wire fraud that adversely affected Plaintiff's activities, which was engaged in interstate commerce through the development of the Renville egg production facility.

75. Defendants' acts also affected interstate commerce because (a) stolen funds were deposited in financial institutions in the United States and were moved by ACH, wire, and other means that affected interstate commerce, and (b) financial institutions that are engaged in, or the activities of which affect, interstate or foreign commerce were used to facilitate the illegal transactions.

76. The primary purpose and function of this enterprise (hereinafter, the "**Enterprise**") was to allow Roglieri, Martin, DiBerardinis and Humphrey to obtain large sums of money from Plaintiff and other victims through various orchestrated fraudulent and criminal racketeering activities (as "racketeering activity" is defined in 18 U.S.C. § 1961(1), which includes wire fraud pursuant to 18 U.S.C. § 1343).

77. Roglieri, Martin, DiBerardinis and Humphrey engaged in numerous predicate acts of wire fraud in violation of 18 U.S.C. § 1343, because they devised or intended to devise a scheme or artifice to defraud, or obtain money or property by means of false or fraudulent pretenses, representations, or promises, and transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. Specifically:

- Roglieri used interstate wires when he caused the publishing of false information about Prime's business record as described above, which was in furtherance of a scheme devised to defraud the public, including Plaintiff, by fabricating experience in successfully funding large loans for the purpose of obtaining ICA deposits from future borrowers. Roglieri knowingly and willingly participated in the scheme with the specific intent to defraud.

- Roglieri used interstate wires when he caused representatives of Prime to send emails to Plaintiff threatening changes in loan terms if the loan transaction did not close within days of said emails, which was in furtherance of a scheme devised to defraud Plaintiff by creating a false sense of urgency in closing the loan transaction for the purpose of obtaining Plaintiff's $5,000,000. Roglieri knowingly and willingly participated in the scheme with the specific intent to defraud Plaintiff.

- Martin used interstate wires when he sent emails to Plaintiff threatening changes in loan terms if the loan transaction did not close within days of said emails, which was in furtherance of a scheme devised to defraud Plaintiff by creating a false sense of urgency in closing the loan transaction for the purpose of obtaining Plaintiff's $5,000,000. Martin knowingly and willingly participated in the scheme with the specific intent to defraud Plaintiff.

- DiBerardinis used interstate wires when he sent emails to Plaintiff urging that Plaintiff immediately proceed in closing the loan transaction, which was in furtherance of a scheme devised to defraud Plaintiff by creating a false sense of urgency in closing the loan transaction for the purpose of obtaining Plaintiff's $5,000,000. DiBerardinis knowingly and willingly participated in the scheme with the specific intent to defraud Plaintiff.

- Humphrey used interstate wires when she sent emails requesting Plaintiff to execute loan documents and the Deposit Agreement, as well as providing falsified wire instructions, all of which was in furtherance of a scheme devised to defraud Plaintiff by creating a false sense of urgency in closing the loan transaction for the purpose of obtaining Plaintiff's $5,000,000. Humphrey knowingly and willingly participated in the scheme with the specific intent to defraud Plaintiff.

78. Based on the acts described above, Roglieri, Martin, DiBerardinis and Humphrey have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

79. Plaintiff justifiably relied on the false misrepresentations directed at it as part of Roglieri, Martin, DiBerardinis and Humphrey's racketeering activities – including wire fraud – by entering into the Deposit Agreement and depositing $5,000,000 with Prime.

80. As a direct and proximate result of Rogieri, Martin, DiBerardinis and Humphrey's racketeering activities and violations of 18 U.S.C. § 1962(c) described above, Plaintiff has been injured in its business and its property, within the meaning of 18 U.S.C. § 1964(c).

81. As described above, as a result of Rogieri, Martin, DiBerardinis and Humphrey's misconduct, Plaintiff has been damaged in an amount to be determined at trial, but not less than $5,000,000, plus interest, and Plaintiff has incurred and will continue to incur substantial costs in seeking to obtain disgorgement of its funds.

82. Plaintiff is entitled to recover and seeks threefold the damages it has sustained together with the cost of this suit, including reasonable attorneys' fees.

**FIFTH CLAIM FOR RELIEF**
**(Nondischargeability of the Debt under 11 U.S.C. § 523(a)(4) against Debtor)**

83. The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

84. In accordance with 11 U.S.C. § 523(a)(4), a discharge pursuant to 11 U.S.C. § 1192 does not discharge an individual debtor from any debt arising out of the individual debtor's fraud or defalcation while acting in a fiduciary capacity or the individual debtor's embezzlement or larceny of funds.

85. Debtor had a fiduciary duty to Plaintiff by virtue of his control over Prime and the terms of the Deposit Agreement.

86. Prior to the Petition Date, Debtor engaged in a course of conduct amounting to fraud, defalcation while acting in a fiduciary capacity, embezzlement, and larceny. The conduct is

- 16 -

described in detail in the allegations set forth in the paragraphs above, which are incorporated herein by reference.

87. As a result of Debtor's conduct, Debtor is indebted to Plaintiff in the amount of $15,000,000, which is three times the amount of Plaintiff's deposit as allowed under the RICO Act, plus interest and damages to be determined at trial, including, but not limited to attorneys' fees and costs (the "**Debt**") (*see* 18 U.S.C. § 1964(c)).

88. The Debt is not dischargeable under section 523(a)(4) of the Bankruptcy Code.

**WHEREFORE**, 1800 Park Avenue, LLC, respectfully requests that the Court:

A. Enter judgment against Defendants in the amount of damages as may be proven at trial, including statutory and punitive damages;

B. Award Plaintiff its attorneys' fees pursuant to applicable law;

C. Award Plaintiff prejudgment and post-judgment interest;

D. Tax the costs of this action against Defendants;

E. Enter judgment against Debtor: (i) establishing the amount and the validity of the Debt; and (ii) declaring the Debt to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4); and

F. Grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: April 3, 2024

                      **CARPENTER, HAZLEWOOD, DELGADO & BOLEN LLP**

                      By: /s/ Chad P. Miesen
                           Chad P. Miesen, Esq.
                           1400 E. Southern Avenue, Suite 400
                           Tempe, Arizona 85282
                           (480) 427-2800
                           Email: chad@carpenterhazlewood.com
                           *Attorneys for 1800 Park Avenue LLC*