UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

In re:

      KRIS DANIEL ROGLIERI,               **Case No. 24-10157**
                                     **Chapter 11**

                   Debtor.

-----------------------------------------------------------------

PAUL A LEVINE, AS RECEIVER OF PRIME
CAPITAL VENTURES LLC,

                   Plaintiff,

     - against -                       **Ad. Pro. No.**

KRIS DANIEL ROGLIERI,

                   Defendant.

-----------------------------------------------------------------

### ADVERSARY PROCEEDING COMPLAINT OBJECTING TO DISCHARGEABILITY AND DISCHARGE

      Paul A. Levine, Esq. Permanent Receiver of Prime Capital Ventures, LLC, as and for his

adversary proceeding complaint against debtor Kris Daniel Roglieri, states as follows:

### Parties

      1.     Plaintiff Paul A. Levine, Esq. (the "Receiver") is the Permanent Receiver of

Prime Capital Ventures LLC, having first been appointed as temporary receiver by order entered

January 12, 2024 and then as permanent receiver by Memorandum-Decision and Order of the

United States District Court entered January 24, 2024 in the civil action captioned *Compass-*

*Charlotte 1031, LLC v. Prime Capital Ventures, LLC et al.* (24-cv-55 NDNY).

      2.     Debtor Kris Daniel Roglieri ("Debtor") is the debtor in this case having

voluntarily commenced a case under Subchapter V of Chapter 11 of the United States

Bankruptcy Code in this Court on February 15, 2024.

## Venue and Jurisdiction

3.      Venue of this case and this adversary proceeding is proper pursuant to 28 U.S.C. §§1408 and 1409.

4.      This Court has jurisdiction over this adversary proceeding, which is a core proceeding, pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a) and §157(b)(2)(i) and (j).

## Preliminary Statement

5.      The Receiver commences this adversary proceeding to assert claims for money damages and non-dischargeability on behalf of Prime Capital Ventures, LLC ("Prime") against the Debtor for his fraud and defalcation while acting in a fiduciary and other pervasive misconduct which caused damages exceeding $100,000,000 to Prime and to creditors of Prime.

6.      This adversary proceeding also objects to discharge due to Debtor's self-admitted failure to keep or even maintain records from which his financial condition may be ascertained and his failure to explain the loss of assets or a deficiency of assets to meet his liabilities. The Debtor should also be denied his discharge based on other misconduct.

## Background

7.      Prime is a Delaware Limited Liability Company having its principal place of business located at 66 Pearl Street, Albany, New York 12207.

8.      Upon information and belief, Debtor is the sole member of Prime.

9.      At his meeting of creditors, Debtor stated that he, and he alone, had access to Prime's bank accounts.

10.     Prime Commercial Lending LLC ("PCL") is, upon information and belief, a New York Limited Liability Company, having its principal place of business located at 66 Pearl Street, 10th Floor, Albany, New York 12207 and Debtor is its sole member.

11.     Commercial Capital Training Group LLC ("CCTG") is, upon information and belief, a New York Limited Liability Company, having its principal place of business located at 66 Pearl Street, 10th Floor, Albany, New York 12207 and Debtor is its sole member.

12.     Finance Marketing Group LLC ("FMG") is, upon information and belief, a New York Limited Liability Company, having its principal place of business located at 66 Pearl Street, 10th Floor, Albany, New York 12207 and Debtor is its sole member.

13.     National Alliance of Commercial Loan Brokers ("NACLB") is, upon information and belief, a New York Limited Liability Company, having its principal place of business located at 66 Pearl Street, 10th Floor, Albany, New York 12207 and Debtor is in control of NACLB.

14.     FUPME LLC ("FUPME") is, upon information and belief, a New York Limited Liability Company, having its principal place of business located at 66 Pearl Street, 10th Floor, Albany, New York 12207 and Debtor is its sole member.

15.     Shark Ventures LLC ("Shark") is, upon information and belief, a Montana Limited Liability Company, having its principal place of business located at 3011 American Way, Missoula, MT 59808 and Debtor is its sole member.

16.     Prime's alleged purpose was to be a dedicated fund created to provide commercial real estate financing for large commercial real estate, energy and infrastructure projects nationally and internationally.

17.     Prime was formed as a Delaware limited liability company on December 14, 2021.

18.     Debtor informed the Receiver that he is the sole manager of Prime and acts as its CEO.

3

19.    Debtor also informed the Receiver that Prime has no employees, and its business associates are all independent contractors.

20.    Prime allegedly provided financing to third parties in the form of lines of credit.

21.    To provide these lines of credit, Prime required borrowers to provide a 20% cash deposit upfront based on the total project cost (called an "interest credit account" or "ICA deposit"), which Prime was to hold "as prepaid interest throughout the term of the loan" and as interest payments became due Prime would deduct them from the ICA.

22.    Based on a review of the documents and information obtained to date in this matter, the Receiver has discovered that since being operational Prime has entered into numerous agreements with third parties to provide lines of credit and in doing so has received well over $100,000,000 in various ICA deposits.

23.    Prime, through Debtor, has acknowledged in connection with Prime's now dismissed involuntary bankruptcy case that it had received ICA deposits that it had not returned.

24.    Prime, however, has failed to fund a significant  portion of those loans and has also failed to return the ICA deposits on those very same loans.

25.    Below, in estimated chronological order, is a summary of some of the known instances where Prime has agreed to provide lines of credit and received ICA deposits for the lines of credit but has failed to fund the loans or return the full ICA deposits.[1]

**Onward Partners, LLC ("Onward") - $3,000,000 Missing**.

26.    In federal court filings it is alleged by Onward that in September 2022, Prime entered into a Business Expansion Line of Credit Agreement with Onward whereby Prime was required to provide a $107 million line of credit.

---

[1] These summaries are just some of the known instances, however, the Receiver believes the total amount is much higher.

27.     On September 22, 2022 Onward and its affiliate wired $20 million to Prime to establish an interest credit account (called an "ICA Payment" under their agreement), which was to be used solely to pay interest payments once Prime had extended the line of credit.

28.     Prime was required to make the first advance on the line of credit to Onward by February 9, 2023, but failed to do so, and has failed to do so since then.

29.     Onward demanded its deposit back but has never received the full amount.

30.     Onward filed a federal court lawsuit against Prime and Roglieri in the United States District Court for the District of Utah on November 13, 2023 alleging, among other things, fraud, conversion, unjust enrichment and piercing the corporate veil (*In re Onward Partners, LLC v. Prime Capital Ventures, LLC, 23-cv-833).*

31.     According to the Complaint filed in that case, Onward was able to get Prime to refund $16 million of its ICA Payment (and then refund an additional $1 million shortly after the lawsuit was filed) but that Prime still had not refunded the remaining $3 million balance of their ICA Payment.

32.     According to the Onward case docket, Debtor's response to the Onward Complaint was due on December 6, 2023 and Prime's response was due on December 12, 2023. By failing to timely respond, Debtor and Prime have admitted the allegations in the Onward Complaint, including the allegations about their fraud and conversion.

33.     Judgment against Debtor and in favor of Onward was entered for $3,000,000.

**B&R Acquisition Partners - $4,300,000 Missing.**

34.     B&R Acquisition Partners ("B&R") commenced a JAMS arbitration against Prime in August 2023, and B&R has alleged that it made a $4,300,000 ICA payment on November 30, 2022 for a purported $22,575,000 loan, but that the loan was never made and the deposit never returned.

5

35.     B&R has since obtained an arbitration award for $4,300,000 and has converted that award into a judgment.

### 526 Murfreesboro, LLC - $4,312,500 Missing.

36.     According to a Declaration of Daniel Cosgrove (the "Cosgrove Declaration") filed in *In re Prime Capital Ventures, LLC, 23-11302* (Bankr. N.D.N.Y.) on December 19, 2023, 526 Murfreesboro, LLC ("526 Mulfreesboro") and Prime entered into a Development Line of Credit Agreement in the maximum amount of $18,112,500 for the purpose of converting a motel into a boutique hotel in Nashville, Tennessee. As a condition of obtaining the loan from Prime, the line of credit agreement required 526 Mulfreesboro to create an Interest Credit Account by depositing $4,312,500 into Prime's account.

37.     On April 7, 2023, 526 Murfreesboro wired $4,312,500 into Prime's specified bank account. As set forth in the Cosgrove Declaration, Prime did not fund the loan and 526 Murfreesboro has exercised its right to terminate the line of credit and demand return of their Interest Credit Account deposit.

38.     According to the Cosgrove Declaration, Prime has not returned their Interest Credit Account deposit of $4,312,500.

### HCW Biologics Inc. - $5,250,000 Missing.

39.     Based on a publicly available reports that  HCW Biologics Inc. ("HCW") filed with the United Stated Securities and Exchange Commission ("SEC"), HCW and Prime entered into a Development Line of Credit Agreement dated April 21, 2023 in the principal amount of $26,250,000, and pursuant to that line of credit HCW was required to wire Prime $5,250,000 to serve as a deposit for the payment of the interest under their agreement.

40.     Prime never funded this line of credit and HCW exercised its right to terminate the line of credit agreement.

6

41.     Upon information and belief, Prime has not returned HCW's $5,250,000 deposit.

**Compass-Charlotte 1031, LLC ("Compass-Charlotte") - $15,902,250 Missing.**

42.     Compass-Charlotte decided to obtain a loan from Prime and Kimmy Humphrey, the Executive Vice President of Prime (and a key associate of Debtor), traveled to Charlotte, North Carolina and met in person with Compass-Charlotte officers, including touring the site for Compass-Charlotte's multi-family build.

43.     On March 27, 2023, Prime represented that it had the ability to fund a $75 million loan in the form of a "Commitment to Fund Letter." Prime promised to fund $75,725,000 "via a non-recourse, asset-backed Line of Credit" with a term of 60 months and an interest rate of 7.5%.

44.     Compass-Charlotte (as borrower) then entered into an April 24, 2023 Development Line of Credit with Prime (as lender), whereby Prime was to make a loan for $79,511,250 (the "Compass Prime Agreement").

45.     The Compass Prime Agreement was signed by Debtor as CEO of Prime.

46.     Pursuant to the terms of the Compass Prime Agreement, Compass-Charlotte wired the sum of $15,902,250 to Prime as an "ICA Payment" on April 27, 2023 to Prime's account at Citi Bank N.A., 388 Greenwich Street, New York, New York (the "Compass Deposit"). The Compass Deposit was to be held in an "Interest Credit Account" held by Prime. The Compass Prime Agreement specifically provided that "All credits to the Interest Credit Account shall be used . . . for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable."

47.     Prime received the Compass Deposit in its Citi Bank account.

48. Since April 27, 2023, Prime has had the Compass Deposit, but never advanced any funds or provided a line of credit. On October 27, 2023, Compass-Charlotte demanded the return of its deposit.

49. Compass-Charlotte also demanded to know where the Compass Deposit was held and for Debtor, Kimmy Humphrey, and Prime to provide bank account statements showing where the Compass Deposit was held. Debtor and Kimmy Humphrey told Compass-Charlotte that the Compass Deposit was not in the Citi Bank account but was held at the Royal Bank of Canada ("RBC") with a hedge fund and they just needed to get the funds released from a line of credit. Compass-Charlotte asked for a contact at RBC to confirm the Compass Deposit was there, but Prime refused to provide that information.

50. Prime has never returned the Compass Deposit.

**Camshaft CRE 1, LLC - $12,400,000 Missing.**

51. Pursuant to a Complaint filed in the case of *In re Camshaft CRE 1, LLC v. Prime Capital Ventures, LLC, 2023-023173-CA-01* (Circuit Court, Miami-Dade County, Florida), that was filed on September 15, 2023, Camshaft CRE 1, LLC ("Camshaft") made an ICA Payment to Prime on May 12, 2023 in the amount of $13,400,000, and Prime failed to return the deposit.

52. Prime failed to respond to the Camshaft complaint and on May 19, 2023, Camshaft filed a Motion for Entry of Judgment against Prime in the amount of $12,400,000 and "requiring specific performance from Prime to return the ICA Payment in the sum of Twelve Million Four Hundred Thousand Dollars ($12,400,000.00) to Camshaft within seven (7) calendar days of the issuance of this Final Judgment."

53. Accordingly, it appears that Camshaft only got $1 million back of the alleged $13.4 million it paid, and Prime has not been refunded the remaining $12.4 million.

8

**Newlight Technologies, Inc. - $2,500,000 Missing.**

54.     On December 19, 2023, Compass-Charlotte and other Prime creditors filed an involuntary bankruptcy petition against Prime (*In re Prime Capital Ventures, LLC, 23-11302* (Bankr. N.D.N.Y.) (the "Prime Bankruptcy Case"), which was eventually dismissed upon motion of the petitioning creditors on January 9, 2024.

55.     Pursuant to a Declaration of Michael Collins filed by Newlight Technologies, Inc. ("Newlight") in the Prime Bankruptcy Case, Newlight asserted that on May 23, 2023 (the "Collins Declaration"), Newlight entered into a line of credit agreement with Prime, which was signed by Debtor, in the principal amount of $13,125,000.

56.     According to the Declaration, Newlight wired $2,500,000 to Prime as an ICA Payment per their agreement, which was to be held by Prime in an "Interest Credit Account" and to be used only "for the purpose of payment of interest payable on the Advances as and when such interest payments are due and payable" under the line of credit agreement.

57.     Prime did not advance any funds to Newlight under the terms of their line of credit agreement and to date, Prime has failed to return Newlight's deposit, despite repeated demand.

**ER Tennessee LLC - $15,000,000 Missing.**

58.     Pursuant to a Complaint filed in the case of *ER Tennessee LLC v. Prime Capital Ventures, LLC and Berone Capital LLC, 650231/2024* (New York County Supreme Court), that was filed on January 16, 2024, ER Tennessee LLC ("ER Tennessee") made an advance of $15,000,000 to Prime pursuant to an Intercreditor Agreement dated August 25, 2023, in furtherance of a Business Expansion Line of Credit Agreement in the total amount of $46,350,000.

59.     According to that Complaint, ER Tennessee's $15,000,000 deposit was to be deposited in a locked pledge account at the RBC and segregated from all other accounts and funds deposited therein and only to be used for the purpose of securing the capital for the line of credit.

60.     ER Tennessee alleges that only five days after its advances were deposited in the RBC account, that $7,000,000 were transferred to an account at Farmers State Bank and that in October 2023, $6,000,000 were advanced from RBC under a Credit Access Line, but that money was never paid to ER Tennessee and that Prime has not advanced funds under the terms of its line of credit.

61.     In state court, ER Tennessee is seeking to recover its $15,000,000 advance, plus attorney's fees and expenses.

**Motos America Inc.  - $3,000,000 Missing.**

62.     The Receiver was contacted by Motos America Inc. ("Motos") and made aware of a Revolving Business Expansion Line of Credit Agreement dated September 21, 2023 between Motos and Prime in the principal amount of $15,000,000. In accordance with that line of credit agreement, Motos made an ICA deposit to Prime in the amount of $3,000,000.

63.     Motos has advised that Prime never funded that line of credit and as a result, Motos has formally terminated the line of credit pursuant to its terms and requested a full refund of its ICA deposit.

64.     Upon information and belief, Prime has not returned Moto's ICA deposit of $3 million.

### 1800 Park Avenue LLC - $5,000,000 Missing.

65.    Upon information and belief, 1800 Park Avenue LLC ("1800 Park") approached Prime in October 2023 regarding obtaining a construction loan request to fund a line of credit for over $105 million.

66.    On October 20, 2023, 1800 Park received a "Terms and Contingent Letter of Intent" with Prime for that line of credit, which 1800 Park singed on October 25, 2023, and per that term sheet, 1800 Park was required to fund an ICA deposit to Prime in the amount of $26,277,562.

67.    Prime and 1800 Park then both signed a Commitment Fund Letter dated December 12, 2023, wherein Prime agreed to fund a line of credit in the amount of $98,905,467.

68.    On December 19, 2023, which was after Prime's Bankruptcy Case was commenced, 1800 Park was informed by a representative of Prime Commercial that if they did not make a soft close happen that week, they may lose the deal.

69.    Thereafter, 1800 Park and Debtor, on behalf of Prime Commercial, entered into a Deposit Agreement on December 22, 2023, wherein 1800 Park agreed to provide a $5 million deposit and Prime Commercial agreed to hold the deposit in a separate and distinct account for 1800 Park to later use in a loan transaction, and that the deposit was to be held as a trust fund and not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party.

70.    Per the Deposit Agreement, 1800 Park wired $5,000,000 to the KeyBank account provided by Kimmy Humphrey.

71.    After that, 1800 Park learned of the Prime Bankruptcy Case and demanded return of its $5 million deposit.

**Piper Capital**

72.      Based on information the Receiver has obtained from its manager Michael Brad
Henshaw, on May 31, 2023, Piper Capital entered into a Line of Credit Agreement (the "Piper
Prime Agreement") with Prime Capital Ventures, LLC ("Prime").

73.      Pursuant to the terms of the Piper Prime Agreement, Piper was to wire Prime an
interest credit account deposit (ICA deposit) in the amount of $10,600,000.  In exchange, Prime
was obligated to provide Piper with a $31,800,000 line of credit.

74.      Debtor informed Mr. Henshaw that Piper's ICA deposit would be placed with a
hedge fund and used to achieve a multiplier such that Prime would be able to provide Piper with
the line of credit.

75.      That is consistent with what Debtor informed the United States Bankruptcy Court
in his statements on December 28, 2023, that Prime had put $50+ million with Berone Capital
and that whenever an ICA payment came in "we log it on our books and essentially we add it to
our fund account [at Berone Capital] so we can start that process of leveraging it." .

76.      Pursuant to the terms of the Piper Prime Agreement, Mr. Henshaw caused Piper
to wire a total of $10,600,000 to Prime's bank account at KeyBank (Account XXXX2233) on
May 31, 2023 (the "Piper ICA Deposit").

77.      Mr. Henshaw sent the $10,600,000 in a total of three wires, two for $5,000,000
each and one for $600,000.  Those wires are reflected on Prime's May 2023 KeyBank account
statement as follows:

78.      The May 2023 KeyBank account statement reflects that Prime had a balance of
less than $100,000 in that account prior to receipt of the Piper ICA Deposit.

79.     Immediately after receipt of the wires from Piper (May 31, 2023), the KeyBank account statement reflects a May 31, 2023 wire out to Truss Financial in the amount of $3,000,000.00.

80.     There was also an additional wire to Truss Financial on June 2, 2023, also from the funds deposited by Piper in the amount of $225,000.

81.     According to Mr. Henshaw, he was provided no evidence that the Piper ICA Deposit was ever placed with a hedge fund.

82.     According to its website, Truss Financial is a bridge lender and not a hedge fund. https://www.trussfin.com/about

83.     Truss Financial LLC filed a Summons with Notice against Prime Capital Ventures on April 5, 2023 in the Supreme Court of the State of New York County of Kings.

84.     It states in relevant part: The nature of this action is for breach of various intercreditor agreements between the parties. Defendant has failed to return to Plaintiff the sum of $13,400,000.00 in accordance with the aforementioned agreements, causing a broad range of damages to Plaintiff including but not limited to the loss of $13,400,000.00, loss of business opportunities and other consequential damages resulting from Defendant's breach and wrongful and deceitful conduct.

85.     On April 11, 2023, Truss Financial LLC filed a First Amended Summons with Notice which revised the amount remaining outstanding down to $3,900,000.

86.     On May 22, 2023, Truss filed a Notice of Discontinuance without prejudice.

87.     At no time did Prime or Debtor inform Mr. Henshaw that they would use Piper's ICA deposit to pay off money owed to other creditors, such as Truss.

88.    At no time did Prime or Debtor inform Mr. Henshaw that they would use Piper's new money to pay the claims of old and existing creditors.

89.    At no point in time did Mr. Henshaw authorize Prime or Debtor to use any of Piper's ICA deposit to repay money owed to Truss Financial LLC or any other creditor.

**SP Harbor**

90.    Based on the Declaration of Matthew Fistonich the Receiver is aware of the following.

91.    In September 2023, SP Harbor discussed with Prime the possibility of Prime providing SP Harbor with a Development Line of Credit. In its communications, Prime promised that it would provide a Development Line of Credit in the amount of $52,815,000.00 at an interest rate of 7.75%.

92.    On October 3, 2023, SP Harbor entered into an Amended and Restated Deposit Agreement with Prime Capital (the "Deposit Agreement").

93.    On October 5, 2023, SP Harbor wired $2.5 million to Prime's KeyBank account XX2233 (the "Prime KeyBank Account") per the wire instructions provided by Prime which were attached to the Deposit Agreement.

94.    SP Harbor subsequently demanded that its $2.5 million deposit be returned.   On December 19, 2023, Prime responded that the deposit would be returned.

95.    Despite Prime and Debtor's agreement and covenant, the Prime KeyBank Account was not a "segregated account" but instead appears to have been a regular operating account for Prime.

96.    According to that statement, Prime had a balance of $473,173.60 in the Prime KeyBank Account before receipt of the $2.5 million wire from SP Harbor.

14

97.   Although Prime and Debtor had promised that they would "**not deliver custody or possession of any of the Deposit Amount to anyone**," that promise appears to have been knowingly false since Prime immediately used SP Harbor's $2.5 million deposit for other purposes.

98.   The account statement shows that on October 5, 2023 (the day the SP Harbor wire was received), Prime transferred out $62,000 from the Prime KeyBank Account, thus leaving $411,173.60 of prior funds, plus the $2.5 million from SP Harbor.

99.   The **very next day** after receiving the wire, the account statement shows that Prime began improperly dissipating the SP Harbor deposit in direct contradiction of its promise that it would "**not deliver custody or possession of any of the Deposit Amount to anyone**."

100.  From October 6, 2023 to October 12, 2023, the account statement shows that Prime dissipated the entirety of SP Harbor's $2.5 million deposit.

101.  Prime's use of SP Harbor's funds at the direction of Debtor was directly contrary to the terms of the Deposit Agreement in which Prime explicitly agreed that it would "**not deliver custody or possession of any of the Deposit Amount to anyone**."

**Vast Sums are Unaccounted For**

102.  Based on current information of Prime's account at Farmers Bank, ICA deposits of $99,340,492 were received by Prime and $24,307,178 was returned to third-party borrowers.

103.  An examination of Prime's KeyBank and Citibank accounts showed a total of approximately $83,662,632 in potential additional ICA deposits with  approximately $33,328,750 returned to the third-party borrowers

104.  With regard to its Citibank account, Prime received during the period of September 2022 through December 2024 a total of $143,608,453.02 and disbursed a total of $142,857,067.81.

15

105.    Under its business model, Prime was obligated to use ICA deposits for interest payments on loans to be made by Prime.

**Misuse of Some of the Missing Funds**

106.    The Receiver has received evidence that a majority of the ICA deposits deposited into Prime's accounts were not used for such purposes.

107.    By way of example at least a total of **$16,396,702.63** was transferred to the following parties from Prime's accounts:

a.  Debtor and T. Roglieri's[2] personal account (the "Roglieri Account"):

| | |
|---|---|
| Transfers out to Roglieri Account | $6,580,683.93 |
| Transfers in from Roglieri Account | $670,000.00 |
| **Net to Roglieri Account** | **$5,910,683.93** |

b.  CCTG's Account:

| | |
|---|---|
| Transfers out to CCTG Account | $5,111,625.70 |
| Transfers in from CCTG Account | $288,000.00 |
| **Net to CCTG** | **$4,823,625.70** |

c.  Prime Commercial's Account (the "PC Account"):

| | |
|---|---|
| Transfers out to PC Account | $5,632,893.00 |
| Transfers in from PC Account | $9,500.00 |
| **Net to PC Account** | **$5,642,393.00** |

d.  NACLB's Account:

| | |
|---|---|
| Transfers out to NACLB Account | $20,000.00 |

**Total - $16,396,702.63**

108.    At his meeting of creditors, Debtor could not or would not identify any legitimate business purpose for the transfers of these monies.

109.    Additionally, the Prime accounts show that there has also been a significant dissipation of Prime's assets as a result of Debtor making substantial luxury purchases with Prime funds related to vehicles, watches, jewelry, antiques and private plane charters.

---

[2] T. Roglieri is the Debtor's estranged spouse.

110.    Based on a review of the KeyBank and Citibank account statements obtained to date, below is a preliminary summary of some of the identifiable luxury purchases made with Prime funds (once more of the purchases are able to be discerned, these totals will only go up):

**Purchases or Expenditures that Appear related to Vehicles:[3]**

| DATE | AMOUNT OUT | AMOUNT IN | BANK | PAYEE |
|---|---|---|---|---|
| 10/16/22 | $148,688.79 | | KeyBank | AI Design |
| 11/30/22 | $218,447.96 | | Citibank | Cars USA Shipping |
| 12/9/22 | $88,247.39 | | Citibank | Capital Ford Inc. |
| 12/12/22 | $2,344,454.00[4] | | Citibank | Scott Oliver Law (Purchase of Mercedez Benz AMG) |
| 12/15/22 | $10,705.48 | | KeyBank | AI Design |
| 12/27/22 | $16,500.00 | | KeyBank | RENNtech Inc. |
| 1/12/23 | $129,241.89 | | Citibank | AI Design |
| 2/3/23 | $108,001.77 | | KeyBank | AI Design |
| 2/16/23 | $97,537.50 | | KeyBank | AI Design |
| 2/28/23 | $3,811,000.00 | | Citibank | Bonhams Butterfields Trust |
| 3/13/23 | $93,544.34 | | Citibank | AI Design |
| 4/25/23 | $3,500.00 | | KeyBank | Rockland Auto |
| 4/27/23 | $1,000,000.00 | | Citibank | RM Auctions Inc. (RM Sotheby's) |
| 5/3/23 | $306,800.89 | | Citibank | AI Design |
| 5/15/23 | $1,000,000.00 | | Citibank | RM Auctions Inc. (RM Sotheby's) |
| 5/16/23 | $7,500.00 | | KeyBank | Rockland Auto |
| 5/16/23 | $35,251.00 | | Citibank | CFR Classic LLC |
| 6/6/23 | $62,456.97 | | KeyBank | AI Design |
| 6/7/23 | $304,744.49 | | KeyBank | AI Design |
| 6/27/23 | $46,342.66 | | KeyBank | AI Design |
| 6/28/23 | $203,689.89 | | KeyBank | AI Design |
| 8/25/23 | $228,630.21 | | KeyBank | AI Design |
| 9/13/23 | | $778,364.62 | KeyBank | RM Auctions Inc. (RM Sotheby's) |
| 9/15/23 | $20,000.00 | | KeyBank | Hunter Motorsports |
| 9/18/23 | $37,780.89 | | KeyBank | AI Design |
| 10/23/23 | $77,782.24 | | KeyBank | RENNtech Inc. |

---

[3] Debtor is a collector of luxury sports cars. A detailed online video showing the many cars in his collection can be viewed here: www.youtube.com/watch?v=Fm_p8upe_S8 and some of his cars appear to be individually listed at https://exclusivecarregistry.com/collection/teamloansharks/cars.

[4] This purchase relates to the lawsuit that FUPME filed in Albany County Supreme Court on February 17, 2023, related to K. Roglieri's attempt to buy a Mercedes-Benz AMG One Hypercar, Production Slot #197 for **$2,344,440** (*see* Doc. 1-36 at ¶ 11).

| 10/24/23 | $449,672.93 | | KeyBank | Keeler Motor Car Co |
| 11/2/23 | $91,206.00 | | KeyBank | Keeler Motor Car Co |
| **TOTAL:** | **$10,941,727.29** | **$778,364.62** | | |

(Schedule includes hyperlinks to identified payees)

111.    Thus, from October 16, 2022 through November 2, 2023, at least $10,163,362.67

was spent towards luxury vehicles.[5]

**Purchases Related to Luxury Watches, Jewelry and Antiques:**

| DATE | AMOUNT OUT | AMOUNT IN | BANK | PAYEE |
|---|---|---|---|---|
| 6/22/22 | $95,810.00 | | KeyBank | Wrist Aficionado |
| 8/29/22 | $32,122.05 | | KeyBank | 1st Dibs |
| 11/18/22 | $21,688.29 | | KeyBank | 1st Dibs |
| 11/18/22 | $90,000.00 | | KeyBank | Cedric Dupont |
| 11/28/22 | $25,200.00 | | KeyBank | Cedric Dupont |
| 11/29/22 | $7,700.00 | | KeyBank | Cedric Dupont |
| 11/30/22 | $23,200.00 | | KeyBank | Cedric Dupont |
| 12/7/22 | $124,604.80 | | KeyBank | 1st Dibs |
| 12/12/22 | $85,000.00 | | KeyBank | Prive Porter |
| 12/21/22 | $318,000.00 | | Citibank | Wrist Aficionado |
| 12/23/22 | $19,000.00 | | KeyBank | Cedric Dupont |
| 1/3/23 | $50,000.00 | | Citibank | Wrist Aficionado |
| 1/9/23 | $2,225,000.00 | | Citibank | Platinum Times LLC |
| 1/17/23 | $670,000.00 | | KeyBank | Timepiece Trading |
| 1/18/23 | $121,700.00 | | KeyBank | Giganti and Giganti |
| 1/18/23 | $66,300.00 | | KeyBank | Wrist Aficionado |
| 1/30/23 | $260,000.00 | | KeyBank | Luxury Bazaar |
| 2/14/23 | $88,000.00 | | KeyBank | Wrist Aficionado |
| 3/20/23 | $60,480.00 | | KeyBank | Richemont North |
| **TOTAL:** | **$4,383,805.14** | | | |

(Schedule includes hyperlinks to identified payees)

112.    Thus, from June 22, 2022, through March 20, 2023, at least $4,383,805.14 was

spent towards luxury watches, jewelry, antiques.[6]

---

[5] As acknowledged in a YouTube video that can be found here: https://www.youtube.com/watch?v=ItUK_zG7smk - Debtor's Instagram name/handle/moniker is @teamloansharks. Annexed as Exhibit "F" hereto is a publicly available article related to the work that Debtor had AI Design perform on his Maserati MC12 for his/teamloanshark's use in the 2023 Gold Rush Rally, which relates to many of the vehicle charges noted in the summary.

[6] The Receiver is in possession of documents showing that Debtor cased Prime to purchase a RM 52-10 Tourbillion Skull watch on January 3, 2023 for **$2,275,000.00** with Prime funds.

**Purchases for Private Plane Charters with XO Global:**

| DATE | AMOUNT OUT | AMOUNT IN | BANK |
|---|---|---|---|
| 5/16/23 | $81,820.00 | | Citibank |
| 5/25/23 | $196,500.00 | | Citibank |
| 6/3/23 | $50,000.00 | | KeyBank |
| 6/3/23 | $50,000.00 | | KeyBank |
| 6/6/23 | $64,238.00 | | KeyBank |
| 8/4/23 | $31,600.00 | | KeyBank |
| 8/15/23 | $42,818.00 | | KeyBank |
| 9/15/23 | $28,628.00 | | KeyBank |
| 9/22/23 | $151,000.00 | | KeyBank |
| 10/10/23 | $37,900.00 | | KeyBank |
| 10/12/23 | $100,628.00 | | KeyBank |
| **TOTAL:** | **$835,132.00** | | |

113.    Thus, from May 16, 2023 through October 12, 2023, at least $835,132.00 of Prime funds was spent on private plane charters with XO Global.

114.    Additionally, during the Receiver's January 16, 2024 meeting with Debtor, he confirmed that Prime purchased a luxury home located in Virginia Beach, Virginia (the "Virginia Beach House"). According to the title documents obtained for the Virginia Beach House, the contract price was $3,750,000, and the sale was closed on or about January 31, 2023.

115.    Debtor informed the Receiver that the house was purchased as an investment and that there was no mortgage (i.e. it was purchased with cash). Debtor also stated that the taxes and insurance were paid current, but the Receiver has been provided information showing that the taxes are, in fact, in arrears in the amount of $38,905.26.

116.    The Receiver was advised by Debtor that Kimmy Humphrey lives in the house and pays the utilities, but does not pay rent or the insurance.

117.    Therefore, from roughly March 11, 2022 through December 22, 2023, at least

**$16,396,702.63** of Prime funds were transferred to the accounts of Debtor, T. Roglieri, Prime

Commercial, CCTG and NACLB, and from roughly June 22, 2022 through November 2, 2023,

Debtor purchased at least **$15,352,299.81** of luxury vehicles, watches, jewelry, antiques and

private plane travel with Prime funds – which results in a current total of **$31,749,002.44** of

known and identifiable Prime assets that have been misappropriated, with the number to only

increase once discovery continues as to such matters.

118.    In his bankruptcy case, Debtor filed Periodic Reports (official bankruptcy form

426) for Prime Commercial Lending, LLC, Commercial Capital Training Group, LLC, Digital

Marketing Training Group, LLC, Prime Capital Ventures, LLC, National Alliance of

Commercial Loan Brokers, LLC, Shark Ventures, LLC and FUPME, LLC; entities of which he

is the sole member.

119.    With the single exception of Prime Capital Ventures, LLC, and despite certain of

the entities having received millions of dollars from Prime, each Periodic Report states that the

entity in question "did not maintain formal financial records such as (1) balance sheets (2)

statement of income (loss), or (3) statement of cash flows or that "no financial information is

available for this entity" or "no financial information exists."

120.    Upon information and belief, in an attempt to deflect blame for what by all

appearances appears to be a Ponzi scheme, Debtor actively engaged in fraud by:

a.    forging a fictitious Joint Venture Agreement between Prime and Berone Capital
Fund, LP dated August 16, 2022; and

b.    forging a fictitious RBC account statement dated December 26, 2023 allegedly
showing a balance of $52,364,000 on deposit for the benefit of Prime; funds
which did not exist.

121.    Prime's attorney in the District Court action brought by Compass-Charlotte 1031, LLC has advised the parties and court in that case that the FBI executed search warrants with respect to its investigation of the matters set forth herein.

122.    Further, the FBI has executed seizures of automobiles, luxury watches and other evidence.

123.    Upon information and belief, a federal criminal investigation of Debtor's activities described herein is ongoing.

124.    Despite repeated requests, Debtor has not produced to the Receiver financial records that would reflect the receipt and use of monies paid to its by borrowers.

125.    Debtor has not filed his 2022 tax returns.

126.    As a result of the fact that his affiliates are all pass through tax entities which are reported on his personal tax return, Debtor has therefore not reported tax matters for Prime for any period of its existence and for his affiliates for 2022.

127.    Debtor has likewise not filed his 2023 tax returns.

128.    The Receiver asked Debtor at his Code §341 meeting of creditors for a list of Prime deals that actually closed and were fully funded. His criminal defense counsel refused to let him answer that question under oath and on the records but agreed to provide an answer to the question.  To date that answer has not been provided.

## As and For a First Cause of Action -Code § 523(a)(4)

## Fraud, Defalcation and Embezzlement While Action in a Fiduciary Capacity

129.    All prior allegations are incorporation herein as if fully set forth.

130.    Debtor by reason of his position as sole member and CEO of Prime, and because of this ability to control the business and corporate affairs of Prime, owed Prime the fiduciary

obligations of good faith, trust, loyalty and due care, and was and is required to use his utmost ability to control and manage Prime in a fair, just, honest and equitable manner.

131. Debtor was required to act in furtherance of the best interests of Prime and not in furtherance of his personal interest or benefit.

132. Debtor owed Prime the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Prime and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

133. Under New York's Debtor and Creditor Law Article 10 and Bankruptcy Code §548, Debtor caused Prime to make the fraudulent conveyances set forth above.

134. Under Delaware law, Debtor breached his fiduciary duties, both as manager and sole member of Prime, to Prime and to its creditor by using Prime to engage in a fraudulent Ponzi scheme, committing conversion of corporate assets, stealing corporate opportunities and committing waste of corporate assets.

135. Such conversion also included using borrower's monies to pay at least $1,075,000.00 in attorney retainers; only $100,000.00 of which the Receiver has, to date, been able to recover.

136. Debtor's actions have also caused Prime to incur substantial expense for the Receiver and his professionals.

137. Debtor also owed a duty to each third-party borrower that obtained a line of credit with Prime and submitted an ICA deposit to Prime, to maintain that ICA deposit pursuant to the purposes for which they made the deposit.

138. Debtor breached the duties owed to each third-party borrower whose ICA deposit was utilized for the personal use of Debtor and his affiliates.

139.    As a direct result of such breaches, such third party borrowers have and will assert substantial claims against Prime.

140.    As a direct and proximate result of Debtor's and Kimmy Humphrey's breaches of fiduciary duties, Prime has sustained damages believed to be in excess of $100,000,000.00.

141.    As a result of the foregoing, the Receiver is entitled to judgment in an amount to be determined by the Court but believed to be in excess of $100,000,000.00 against Debtor pursuant to Delaware law and 11 U.S.C. §523(a)(4) that Prime's damages are nondischargeable due to Debtor as a result of the foregoing fraud, defalcation and / or embezzlement while acting in a fiduciary capacity.

### As and For a Second Cause of Action - Code § 523(a)(6)

### Fraud, Defalcation and Embezzlement While Action in a Fiduciary Capacity

142.    All prior allegations are incorporated herein as if fully set forth.

143.    By his actions set forth above, debtor maliciously and willfully caused injury to Prime by exposing it to more than $100,000,000 in liabilities from its borrowers.

144.    The Receiver is entitled to judgment pursuant to 11 U.S.C. §523(a)(6) that Prime's damages are nondischargeable due to Debtor due to his malicious and willful actions that caused such damages.

### As and For a Third Cause of Action

### Debtor is not Entitled to a Discharge Pursuant to 11 U.S.C. § 727(a)(3)

### Failure to Maintain Records

145.    All prior allegations are incorporated herein as if fully set forth.

146.    By his own admission, Debtor has failed to maintain any financial records for certain of his affiliated entities which had received millions of dollars in fraudulent transfers

23

from Prime at the sole direction of Debtor and which would identify the alleged business purpose of such transfers or the purpose of the dissipation of such monies.

147.    Debtor has failed to produce to the Receiver financial records that would reflect the receipt and use of monies paid to its by borrowers.

148.    Debtor has failed to file his 2022 and 2023 tax returns and has failed to file any tax returns related to Prime for the entirety of its existence.

149.    As a result of the foregoing, Debtor's financial condition and business transactions cannot be ascertained.

150.    The failure to do so is wholly Debtor's responsibility.

151.    The Receiver is entitled to a judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(3).

**As and For a Fourth Cause of Action**

**Debtor is not Entitled to a Discharge Pursuant to 11 U.S.C. § 727(a)(5)**

**Failure to Maintain Records**

152.    All prior allegations are incorporated herein as if fully set forth.

153.    Debtor is the sole member of Prime and its affiliated entities.

154.    Debtor's membership interests in Prime and its affiliates are assets of this estate.

155.    At least one borrower and, upon information and belief, several other borrowers will assert direct claims against Debtor for loss of their ICA deposits.

156.    As a result of his complete failure to produce anything a complete account of the financial activities of Prime and its affiliates, Debtor has failed to explain satisfactorily the loss on monies that borrowers paid to Prime and, therefore, the assets that may be available to meet Prime's and Debtor's obligations to the borrowers.

157.    The Receiver is entitled to a judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(5).

**As and For a Fifth Cause of Action**

**Debtor is not Entitled to a Discharge Pursuant to 11 U.S.C. § 727(a)(7)**

158.    All prior allegations are incorporated herein as if fully set forth.

159.    In connection with the involuntary bankruptcy case of Prime, Debtor committed within the last year one or more acts specified in Code §§727(a)(2), (3), (4), (5) and / or (6) including, but not limited, falsehoods regarding the following.

160.    Representing to the Court that the ICA deposits of Compass-Charlotte, 526 Murfreesboro, Newlight and others were in accounts at KeyBank and Citibank.

161.    Representing to the Court that Prime had $2,000,000 on deposit at KeyBank; (iii) representing to the Court that Prime had $2,000,000 in its account at Citibank.

162.    Representing to the Court that Prime had $52,000,000 on deposit at RBC in an account under the name of Berone Capital.

163.    Representing to the Court that Berone had provided Prime a line of credit with which Prime could pay its obligations to borrowers.

164.    Representing to the Court the then present state of its accountant relationship and alleged information in the possession of that alleged accountant.

165.    Representing to the Court that Prime had 26 employees.

166.    Representing to the Court that when ICA deposits were received by Prime, that Debtor caused those ICA deposits to be transferred to Berone Capital.

167.    The Receiver is entitled to a judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(7).

## As and For a Sixth Cause of Action

### Debtor is not Entitled to a Discharge Pursuant to 11 U.S.C. § 727(a)(12)(A) and (B)

168.   All prior allegations are incorporated herein as if fully set forth.

169.   Based on the foregoing and the ongoing federal criminal investigation, there is reasonable cause to believe that the filing of this case was an abuse of the provisions of Title 11.

170.   Based on the foregoing and the ongoing federal criminal investigation, there is reasonable cause to believe that the Debtor will be found guilty of a criminal act as set forth in Code §522(q)(1)(A).

171.   Based on the foregoing and claims asserted by various creditors, there is a reasonable basis to believe that the Debtor will be found to owed a debt arising form a civil remedy under section 1964 of title 18 of the United States Code.

172.   The Receiver is entitled to a judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(12).

## As and For a Seventh Cause of Action

### Debtor is not Entitled to a Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A)

173.   All prior allegations are incorporated herein as if fully set forth.

174.   Upon information and belief, Debtor formed CCTG Holdings, LLC ("CCTG Holdings") as a New York limited liability company on May 16, 2023.

175.   Debtor represented to Interactive Brokers that CCTG Holdings is a "single-owned LLC that makes investments for the purpose to increase revenue."

176.   Debtor represented to Interactive Brokers that he was the 100% owner of CCTG Holdings.

177.   Debtor did knowingly and fraudulently make a false oath by failing to include his ownership of CCTG Holdings in his filed schedules of assets in this case.

178.   The Receiver is entitled to a judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(4)(A).

WHEREFORE, the Receiver respectfully demands judgment against Debtor as follows:

a. On his first cause of action judgment in an amount to be determined by the Court but believed to be in excess of $100,000,000.00 against Debtor pursuant to 11 U.S.C. §523(a)(4) that Prime's damages are nondischargeable due to Debtor as a result of the foregoing fraud, defalcation and / or embezzlement while acting in a fiduciary capacity.

b. On his second cause of action judgment in an amount to be determined by the Court but believed to be in excess of $100,000,000.00 against Debtor pursuant to 11 U.S.C. §523(a)(6) due to his malicious and willful actions that caused such damages.

c. On his third cause of action judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(3).

d. On his fourth cause of action judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(5).

e. On his fifth cause of action, judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(7).

f. On his sixth cause of action, judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(12).

g. On his seventh cause of action, judgment denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(4)(A).

h.  And, such other and further relief as the Court may deem just, necessary and

proper.

Dated: April 22, 2024

Respectfully submitted,

/s/Paul A. Levine
Paul A. Levine, Esq.
LEMERY GREISLER LLC
Office and P.O. Address
677 Broadway, 8th Floor
Albany, New York 12207
(518) 433-8800

Attorneys for Paul A. Levine, as Receiver of
  Prime Capital Ventures