UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

In re

KRIS DANIEL ROGLIERI,

Debtor.

------------------------------------------------------------

**DECLARATION**

**DATE, TIME, & LOCATION
OF HEARING:**

**April 16, 2026, at 10:00 a.m.
United States Bankruptcy
Court for the Northern
District of New York, Albany
Division, James T. Foley U.S.
Courthouse, 445 Broadway,
Albany, NY 12207**

Chapter 7
Case No. 24-10157-1-pgr

**CHRISTIAN DRIBUSCH, ESQ.**, pursuant to 28 U.S.C. § 1746, declares

under penalty of perjury that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York

and in the United States Bankruptcy Court for the Northern District of New York.

I am the managing partner of the Dribusch Law Firm in Albany, New York, where I

specialize in, and have devoted my professional practice to bankruptcy and business

debt restructuring matters.  Among numerous professional organizations and

associations, I am a member of the National Association of Bankruptcy Trustees,

the Panel of Chapter 7 Trustees for the Southern District of New York, and both the

Capital District and Hudson Valley Bankruptcy Bar Associations.

1

2.      Over the course of my 30+ year career, I have served as trustee in connection with thousands of Chapter 7 bankruptcy matters and have earned a strong reputation for effectively, ethically, and successfully discharging my statutory and sworn legal duties as a trustee.  This includes my statutory duty under 11 U.S.C. § 704 to marshal assets and gain a possessory interest in such assets for the benefit of the estate to which I am accountable in a given Chapter 7 matter, and my "principle duty," as prescribed in the United States Trustee Handbook for Chapter 7 Trustees, "to collect and liquidate the property of the estate and to distribute the proceeds to creditors."[1]

3.      I categorically deny any allegation that I tortiously exceeded the scope of my duties in my former role as Chapter 7 Trustee in the instant bankruptcy action concerning Debtor Kris Daniel Roglieri (hereinafter "subject proceedings").  Indeed, movant Linda Oliver's assertions are factually unfounded and legally frivolous.  All of my actions in the subject proceedings were taken pursuant to my statutory and fiduciary Trustee obligations, and plainly complied with the Orders of this Court.

4.      Accordingly, I submit this Declaration and the objections raised herein in response to Ms. Oliver's application seeking leave to commence a civil action against me; this, her second attempt to sue me for simply doing my job, following her initial failed lawsuit in the U.S. District Court for the Northern

---

[1] The "Trustee Handbook" was promulgated by the United States Trustee Program as an instructional guide concerning the duties of Chapter 7 Trustees.

District of New York, which Judge Brindisi resoundingly dismissed under the *Barton* doctrine and other grounds.

5.      This Court should deny Oliver's motion because all I did was discharge my professional trustee duties for the benefit of the Debtor Estate to which I was solely accountable.

## A. I Properly Discharged My Legal Duties as Debtor Trustee

6.      Roglieri's case was originally filed under Chapter 11 Voluntary Petition for reorganization/rehabilitation and thereafter converted to a Chapter 7 Petition for liquidation on motion from the U.S. Trustee. (*See*, Dkt. #159). On May 15, 2024, I was appointed as Interim Chapter 7 Trustee, thereby obliging me to the Debtor Estate, and affording me liberal statutory latitude to act in fulfillment of my duties thereto. (Dkt. #160).

7.      The next day, I moved this Court pursuant to 11 U.S.C. § 542 and Rule 9014 of the Federal Rules of Bankruptcy Procedure for an Order granting turnover of various items, and for access to the Debtor's then residence located in Queensbury, NY (hereinafter "residence"). (*See*, Dkt. #166). During the motion hearing, the Court advised the Debtor that it was my "statutory duty" to "marshal assets" and "gain a possessory interest" in them for the benefit of the Debtor Estate. Notably, the Court also advised Roglieri that neither he nor his counsel could interfere with my entry into the residence for purposes of securing assets and performing my statutory trustee duties. Indeed, the Court "strongly cautioned" the Debtor not to interfere, and that, if my requests were disregarded and the Court

3

had to intervene, "[the debtor would not] like the result." (*See*, Dkt. # 186, pp. 20, 33).

8.    Ultimately, the Court granted my motion and entered a Turnover Order on May 22, 2024. (*See* Dkt. #188). Under the Order, Roglieri was **"immediately"** required to turn over to the Trustee possession, custody and control of the Estate Assets, including, **"but not limited to,"** the Assets listed in an exhibit to the Order. (*Id.*). On May 24, 2024, I met with Roglieri and inventoried various items of artwork and vehicles in his possession, custody, and control. Throughout the ensuing week, I engaged with an auction house for purposes of securing and selling Roglieri's vehicles and artwork, among other Estate Assets. (*See, e.g.*, Dkt # 197).

9.    In the first week of June 2024, however, Roglieri was criminally detained by federal authorities and thereafter remained in federal custody indefinitely throughout the Chapter 7 proceedings. This compromised my ability to coordinate with Roglieri to obtain access to, and secure Estate Assets for eventual sale. He no longer had access to the residence or its contents, so he could not personally facilitate my possession, custody, and control over the Estate Property in accordance with the Turnover Order. (*See, e.g., Id.*). Consequently, I moved for a Supplemental Order to ensure enforcement of the initial Turnover Order, and to reinforce my ability to secure the residence and Estate Assets, which I was statutorily mandated to do under 11 U.S.C. § 704(a). (*See*, Dkt. #197).

10.    Ms. Oliver—Roglieri's girlfriend from New York City who notably did not own, but occasionally stayed and kept personal items at the residence—contacted me around the time of Roglieri's detainment.  I informed her I was the Chapter 7 Trustee and had a duty to secure the Debtor Estate, but that I would work with her and afford her a reasonable opportunity to remove her personal belongings from the residence.  Ms. Oliver unequivocally conveyed her understanding.  She did not question the circumstances or challenge my authority; our interaction was generally cooperative and uncontentious.  I thereafter continued performing my Trustee duties to the Debtor Estate.

11.    Indeed, while I felt a Supplemental Order was needed to *reinforce* my authority to secure the Estate, over the next several days I engaged a locksmith to change the locks, worked with auctioneer representatives to inventory assets at the residence, and met with a prospective purchaser.  All of these required actions were performed in accordance with my Trustee duties and responsibilities under Section 704 of the Bankruptcy Code, and judicially authorized by this Court.

12.    On June 7, 2024, the Court held its hearing on my motion for a Supplemental Order.  During the hearing, I explained that, upon my previous visit to the residence, the property was not in a secure state (due to entry of federal authorities in connection with Roglieri's criminal matter).  Specifically, the home gate was open, a Ferrari was located in the front of the residence with open doors and keys inside, and there was property damage.  In my view, these factors, in tandem with Roglieri's detainment, necessitated a Supplemental Order to mitigate

any doubts concerning, or challenges to my legal authority to secure the residence. (*See*, Dkt. # 193, pp. 8-9).

13.    I also informed the Court I told Ms. Oliver that I had the residence locks changed to further secure the Estate, but that I wanted to ensure she had access to remove her personal items. I suggested Ms. Oliver's visits to remove her property could occur simultaneous with the presence of asset inventory and removal personnel engaged to prepare the assets for sale. (*See*, Dkt. # 193, p. 10). I even provided her with a key to the residence after the lock change so she could efficiently gather her belongings and ultimately vacate.

14.    On June 9, 2024, I met with Ms. Oliver at the residence for a walk-through to confirm the items she was permitted to remove. Significantly, sunglasses and cigars *were **not** among the items* Ms. Oliver was authorized at that time to remove from the residence.

15.    On June 10, 2024, the Court issued the requested Supplemental Turnover Order to help facilitate the discharge of my obligations as Trustee. (Dkt. # 205). The Supplemental Order **"authorized [me] to secure [the residence] for the benefit of the Debtor Bankruptcy Estate and to secure and remove the property of the Debtor Bankruptcy Estate located at the Residence."** (*See*, *Id.*) (emphasis added). Again, this Supplemental Order was secured out of concern that the discharge of my statutory duties would be threatened or impeded by security risks and access issues stemming from Roglieri's detainment. The Supplemental Order was *not* sought to obtain *new* or *additional* legal *powers* as

6

Trustee.  Indeed, as Judge Littlefield correctly characterized during the

Supplemental Order hearing:

> THE COURT:  Do we now have all the appearances?
> Mr. Dribusch, you requested this hearing to, as I understand
> it -- correct me if I'm wrong, ==to aid you in the turnover of==
> ==administration== -- administrative process ==with perhaps some==
> ==more specificity in orders to give comfort to third parties==
> or whatever.  And in a minute, I'd like you to elaborate on
> that if you could.

(*See* Dkt. # 193) (highlights added).

16.    In fact, the express language of the initial Turnover Order

demonstrates the Supplemental Order was sought and issued merely to facilitate

and reinforce the authority conferred by the former; the initial Order plainly stated,

"[i]f the Trustee requires further Orders from the Bankruptcy Court *to effectuate*

*the terms of this Turnover Order* (e.g., assistance of the U.S. Marshall), the

Trustee may request such relief on 3-day notice to the Debtor." (*See*, Dkt. # 188)

(emphasis added).[2]

---

[2] For instance, and in point of fact, as I explained to the Court during the Supplemental Order hearing, I successfully secured three vehicles part of the Estate Assets pursuant to my obligations upon my assessment of the premises following Mr. Roglieri's detainment, and before the Court's issuance of the Supplemental Order. (*See*, Dkt. # 193, pp. 8-9). I properly did so with the assistance of representatives of Saratoga Automobile Museum ("SAM"), the auctioneer referred by the Debtor's counsel, and also repaired the residence front gate, notwithstanding the fact the initial Turnover Order did not *expressly state* I was authorized to do so, as acting in such a manner (*to secure the Estate*) was, is, and always has been a basic and vital function of my duties as Trustee.

17. In sum, consistent with my statutory duties, the initial Turnover Order conferred upon me broad authority to act for purposes of efficiently and securely administering the Debtor Estate to which I was accountable. And this Court's Supplemental Order merely buttressed and reinforced my pre-existing authority to broadly act in satisfaction of my Trustee obligations. Thus, as discussed further below, Ms. Oliver's overarching assertion that various conduct I undertook exceeded the scope of this Court's Orders is factually erroneous and legally unfounded.

18. On June 11, 2024, I was alarmingly informed by SAM auction representatives that they discovered various items had been improperly taken from the residence—among them, **the sunglasses and cigars which Ms. Oliver was not permitted to remove**, as established following the June 9 walk-through. In fact, upon my further inquiry directly to Ms. Oliver, she admitted she impermissibly took these unauthorized items, which at the time, were reasonably and in good faith assessed as Debtor Estate Assets. Further, I discovered Oliver's removal of the cigars was done clandestinely, and plainly with the intent of concealing this unlawful conduct. The cigars were taken out of their boxes and the empty boxes were placed in the residence humidor, prompting me to reasonably conclude this was no "accidental" or mistaken taking, but rather a surreptitious theft of Estate Assets. In addition, given the criminal allegations against her boyfriend-Debtor, I was genuinely concerned Ms. Oliver's removal was part of a large-scale fraud scheme; these concerns accentuated my statutory mandate to do what was

8

necessary to secure the residence and Estate Assets. My ensuing actions to secure the Estate and guard against suspected crime discussed further below were legitimate, necessary, statutorily mandated, legally authorized, and wholly prudent, regardless of whether my well-founded suspicions of fraudulent conduct proved accurate or not. And likewise, whether certain items were subsequently determined to be non-Estate property is beside the point.

19.     Indeed, the gravity of this occurrence cannot be understated. A third party with no ownership or other legally cognizable interest in the residence had seized unauthorized items from the residence in concealed fashion; she abused the access and professional courtesy she was granted, frustrated the principles of this Court's Orders, and severely jeopardized the proper administration of the Debtor Estate. The items Ms. Oliver removed were, at the time, lawfully deemed to be Estate Assets. She was not permitted to take them, she knew she was not permitted to take them, and did so anyways.

20.     Consequently, I was required pursuant to my statutory duties to change the locks again, and limit Ms. Oliver's access. As I explained in my June 12, 2024 text message to her, "it was necessary for me to change the locks again," and would be necessary for "[e]ither me or my representative…to be in attendance when [she was] remov[ing] items so as to ensure no property of the bankruptcy estate [was] removed," including jewelry, sunglasses, and other items reasonably thought to be part of the Estate Assets. (*See*, Ex. G to Oliver Motion [June 12, 2024 "Lockout Text Message"]).

9

21.   Contrary to the misleading label chosen by Ms. Oliver for this Exhibit, she was not "locked out" of the residence or denied access completely (even though such a measure would have been prudent under the circumstances). Rather, she simply could no longer enjoy free, unsupervised access due to her unlawful taking of unauthorized property.

22.   Eventually, various items of office furniture were secured and inventoried by the auctioneer, including a desk chair which was sold. (*See*, Dkt. # 322).   In Ms. Oliver's prior failed NDNY lawsuit, she complained that certain of her personal items were wrongfully secured, including the desk chair which was not among the items returned to her.  While unfortunate, the chair removal/sale did not result from any unsanctioned, tortious, or other unlawful conduct.  It is hardly uncommon in the administration of a debtor's estate for certain non-debtor assets to be reasonably and in good faith mistaken for debtor assets subject to removal and sale.  In fact, this Court during the May 20, 2024 Turnover Order hearing observed as much:

> And realize that he has, if you're the Trustee and you see a widget and it's in the Debtor's possession, there's a presumption that the widget is tied to the Debtor. If it's not, that can be corrected.  Nothing is going to be liquidated.  It's all just he's charged with gathering materials, and that's what he's trying to do.

(Dkt. # 186, p. 35).

23.     Quite simply, items which are found to be in the debtor's possession or control must be gathered by the Trustee for the benefit of the Debtor Estate. The fact Ms. Oliver did not take certain personal items from the residence despite having ample opportunity reasonably led me to conclude such items, like the chair, were Debtor Assets. I was simply doing my job.

24.     Still, Ms. Oliver now doubles down on her many reckless and baseless aspersions in pursuit of a frivolous civil action against me.

**B. <u>Oliver's Latest Allegations and Purported Proposed Claims
are Factually Erroneous and Legally Frivolous</u>**

25.     The allegations in Ms. Oliver's application largely mirror those raised in her failed NDNY lawsuit. Essentially, she once again erroneously claims I "locked her out" of the residence, accessed the residence with representatives on various occasions without proper authority, and unlawfully facilitated the removal and sale of non-Estate items. Each allegation is addressed below.

26.     First, Ms. Oliver asserts that on May 24, 2024, I conducted a "full property walkthrough" of the residence while her "personal belongings were visibly present" therein. (Dkt. # 645, p. 2). To the extent this partly forms the basis for her claim, it should be rejected. Indeed, I did visit the residence on May 24, 2024 with Roglieri present to preliminarily inventory various items. This was a basic and fundamental function of my role as Trustee, and the fact Ms. Oliver's personal items were present and visible is wholly irrelevant.

27.     Next, Ms. Oliver takes issue with my entry upon the residence (and that of various parties involved in the Estate administration), on June 4 and June

11

5, 2024. (Dkt. # 645, p. 3). She erroneously claims this was improper, arguing "entry into an occupied private residence and introduction of third-party liquidation personnel prior to judicial authorization to secure the premises" exceeded the scope of my authority because the initial Turnover Order did not sanction same. (Dkt. # 645, p. 3). She is patently incorrect. This entry was a wholly proper and necessary aspect of my duties as Trustee to secure the Estate and marshal Estate Assets for removal and auction. Indeed, this is bankruptcy trustee practice "101." My statutory Trustee duties, and authority to act in the aforementioned manner to fulfill same, were confirmed in the initial Turnover Order granting me "immediate" possession of the Estate Assets, which necessarily encompassed the Debtor residence. Further, under 28 U.S.C. § 1334(e)(1), the bankruptcy court is vested with exclusive authority over the property *in rem* of the Estate; and by extension, the trustee is the designated fiduciary of the Estate property exclusively within the bankruptcy court's *in rem* jurisdiction. These well settled statutory principles ensure centralized control over the Estate property, such as the residence here, and serve to guard against theft, asset distortion, and other unlawful conduct.

28.    In addition, these entries came after Roglieri's detainment and resulting concerns over the unsecured state of the residence, accentuating the vital objective of securing the residence and possible assets. This conduct in no way "exceeded the scope of authority then in effect"; to the contrary, it was squarely commensurate with my statutory obligations under Section 704, and well within the express and implied confines of this Court's Order.

12

29.    Third, Ms. Oliver reinforces her baseless assertions concerning her being "locked out" on June 12, 2024 when the locks were changed a second time, the fact she was not given a new key, and that she was afforded only supervised access. Here, again, my actions were completely proper and necessary, both to fulfill my statutory duties to the Estate, and comply with this Court's initial Turnover Order and Supplemental Order which collectively vested me with authority to "secure" the residence—including by guarding against theft (which I reasonably suspected), distortion, or loss of possible Estate Assets.

30.    As noted, the locks were changed a second time because Ms. Oliver unlawfully took Estate Assets from the residence; and contrary to her assertions, Ms. Oliver was still afforded reasonable supervised access to claim other items and efficiently vacate the residence. Any claim that she was wrongfully "evicted" is legally erroneous.

31.    Tellingly, as with her prior "Affidavit of Hardship" filed in support of Roglieri's removal application against me, Ms. Oliver in her instant motion again does not assert she was a legal tenant (because she was not). (*See* Dkt. # 417; # 645). Instead, Oliver states she "resided full time" at the residence "prior to and during the relevant events"—a claim flatly contradicted by Roglieri himself, who previously gave sworn 341 testimony that Ms. Oliver would *"occasionally"* stay with him. (*See*, Dkt. # 448 [Memorandum of Law in Opposition to Debtor Removal Application, *citing* Debtor 341 Tr. Exhibit A, p. 18]). In point of fact, during the time the property was being secured, Ms. Oliver did not seek assistance or any relief

13

from the bankruptcy court concerning her access to the residence or personal items. The issue of her "status" relative to the residence was not raised in any manner by Ms. Oliver until approximately six months after my conduct in question, which I performed under the guise she was a mere "occasional" occupant of the residence (*i.e.*, on long weekends)—a label accorded to her by none other than Roglieri himself.

33.    Ultimately, Ms. Oliver ceasing her "stay" at the residence was an inevitable consequence of Roglieri's incarceration and the Estate administration proceedings generally. As this Court knows, such an outcome is an unfortunate, but often necessary aspect of administering a debtor estate in Chapter 7 proceedings. And it was especially vital here given Ms. Oliver's improper taking of unauthorized items. In fact, had I not restricted Ms. Oliver's access upon the revelation of her unlawful property removal, it would have been a grave dereliction of my duties as Trustee.[3] She was not unlawfully "locked out"; she was given reasonable latitude to enter the residence, claim her belongings, and vacate to ensure the safe, efficient, and lawful administration of the Debtor Estate.

33.    Ms. Oliver also distortedly and conclusorily claims that on June 19, 2024, there was an "open house" at the residence without her knowledge, and when

---

[3] *See, e.g.*, Bankruptcy Code, Section 704, and Trustee Handbook, Ch. 4.C.3, 6 (collectively dictating that, where the debtor has **control or possession** of property which appears to have value for the estate, the trustee **must obtain control over the property**, which may include, *inter alia*, **changing the locks at the premises**, and that the trustee also must immediately **take all other steps which may be reasonably necessary to preserve the assets**).

she still occupied the home, and that during the open house a "person" was captured "talking about stealing something." (*See*, Ex. C to Oliver Motion). This vague allegation is unsubstantiated and meritless, and even assuming an attendee was captured making reference to theft (which I never heard, observed, or was otherwise made aware of), nothing about this allegation supports any claim that I unlawfully exceeded the scope of my Trustee duties.

34.    Here, again, it was appropriate and in no way unordinary (certainly not unlawful), for me as Trustee to arrange an open house in connection with the Estate administration. Notwithstanding her "occupancy," Ms. Oliver did not have a legal right to be notified of the open house in advance; and as the June 19 text messages between Ms. Oliver and the SAM representative make clear, I was of course present during the showing to monitor the residence and Estate assets. The fact her alleged personal belongings remained present inside the residence is wholly immaterial. In short, there was nothing improper or unauthorized, much less nefarious, about my conduct here. It was yet another example of me properly discharging my Trustee duties for the benefit of the Estate.

35.    Fourth, for the sake of completeness, and to the extent they partly form the basis of Ms. Oliver's instant application, the allegations she previously raised in her failed NDNY action concerning my "pattern of misconduct," including my alleged "seizing and concealing" of various items for personal profit, such as wine, shoes, and sunglasses, are palpably false. The wine, shoes, and sunglasses were Estate Assets over which my auctioneer took proper possession. I ultimately

15

secured a Sale Order from the Court to sell the shoes and sunglasses (which were later sold under the jurisdiction of the new trustee). Further, the wine was abandoned and returned under this Court's Order of Abandonment because the Debtor left the wine in a garage, rendering it unsaleable.

36. That these items were not listed in the initial Asset inventory does not support her claim, as the inventory was eventually supplemented to include these items. And further, any claim that I sought to personally profit with these items is outlandish, and wholly unfounded because the items were in the possession, custody and control of the auctioneer. I never had physical possession of them.

37. Frankly, the absurdity of Ms. Oliver's baseless accusations to the contrary shocks the conscious. I have been a trustee since 1996; before Ms. Oliver's complaints against me in the present matter, not once during my decades-long career has anyone—a debtor, debtor representative, U.S. Trustee, court, or third-party—so much as hinted that I misappropriated estate property. Ms. Oliver's claim that I did so here is, was, and has always been an intentional, vindictive, and unfounded attack on my integrity and reputation. My only recourse is this Court, and the function it is afforded under controlling case law to protect appointed trustees from frivolous claims like Ms. Oliver's here.

38. Moreover, even assuming the above items were mistakenly removed, the remedy for such an occurrence is returning the property to the non-debtor upon proof of ownership. As Ms. Oliver admits, with the exception of the office chair

16

which she only conclusorily, and self-servingly claims was hers, and which was in good faith removed, her other personal items were restored to her. As this Court knows, where an individual is given a reasonable opportunity to claim personal property, but fails to do so, the trustee may deem it abandoned and administer it (usually by disposing it).

39.    Lastly, contrary to Ms. Oliver's baseless and reckless attack on my character, my voluntary resignation as Chapter 7 Trustee in May 2025 was not prompted by any "scrutiny" over my actions undertaken as Trustee in the subject proceedings. As this Court knows, I forcefully opposed the Debtor's removal application, explaining in detail the prudent actions I took in discharging my Trustee duties, and ultimately establishing all the allegations of misconduct raised by Roglieri and Ms. Oliver against me were factually and legally fictitious. (*See*, Dkt. # 448). I voluntarily and appropriately resigned for personal reasons, and with the hope and aim that my replacement would properly serve the ongoing needs of the Debtor Estate at that juncture.

40.    Though it troubles me to raise it here, the primary personal reason for my voluntary resignation concerns my son Craig, who since early childhood has been diagnosed with autism spectrum and severe developmental disorders. Over the last several years, my wife and I have been mired in a contentious legal dispute with the State concerning my son's ability to live at a treatment facility. Suffice it to say, this has caused immense hardship for my wife and I; and at the time of my resignation, our efforts to help our son met peak challenges, which are ongoing.

17

41.     In short, I resigned to devote more time and efforts to my at-risk son. Ms. Oliver's reckless, baseless, and destructive attacks to the contrary are, frankly, deplorable.

42.     In sum, Ms. Oliver's sought-after state law claims against me for trespass, "ultra vires" conduct, "constructive dispossession," and conversion are not only meritless, but patently frivolous as a matter of law because the alleged acts underlying these purported claims were undertaken strictly in accordance with my statutory duties as Chapter 7 Trustee, and in fulfilment of my fiduciary obligation to the Debtor Estate.  I did not trespass upon the residence (or any property Ms. Oliver owned); nor did I steal or convert her property or otherwise exceed the scope of my legal, ethical, and fiduciary Trustee duties.

43.     Accordingly, for the foregoing reasons and those set forth in the accompanying submission by my counsel, this Court should hold true to its "strong interest in protecting [an appointed Trustee] from unjustified liability for acts taken within the scope of his official duties," as here, and deny Ms. Oliver's application in its entirety.  *See, In re Lehal Realty Assocs.*, 101 F.3d 272, 276 (2d Cir. 1996).

Dated: April 3, 2026

CHRISTIAN DRIBUSCH, ESQ.

18

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

In re
KRIS DANIEL ROGLIERI,

                                              Chapter 7
                                              Case No. 24-10157-1-pgr

                        Debtor.
-----------------------------------------------------------

### Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

The foregoing document complies with Federal Rule of Bankruptcy Procedure 8013(f)(3)(A) and to the extent applicable, 8015(h), because, excluding the exempted parts of the document, it contains 4,439 words, and has been prepared in a proportionally spaced typeface with Microsoft Word using Century Schoolbook, 12-point font.

Dated: April 6, 2026

_____
Thomas J. DeBernardis